UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20340-WILLIAMS

UNITED STATES OF AMERICA,

vs.

MASPHAL KRY,

      Defendant.

_____/

## DEFENDANT MASPHAL KRY'S MOTION TO COMPEL

Defendant Masphal Kry respectfully moves the Court to compel the government to: (1) identify for defense counsel a discrete subset of documents consistent with government's obligations under *Brady v. Maryland*, *Giglio v. United States* and their respective progeny; (2) produce early witness and exhibit lists; (3) produce records of payments and information pertaining to benefits provided to the government's principal cooperating witness (the "Cooperating Witness"); (4) produce all transcripts, statements, or records of statements reflecting statements made by the Cooperating Witness, including grand jury testimony, FD-302s, and ROIs, as well as all evidence of wrongdoing, criminal conduct, or participation in the conspiracy by the Cooperating Witness; and (5) produce all communications related to the agreement between the Cooperating Witness and the government.

### BACKGROUND

The superseding indictment (the "Indictment") in this case was returned by a federal grand jury on November 3, 2022, and was unsealed on November 16, 2022, following the arrest of Defendant Masphal Kry. The Indictment alleges that between December 19, 2017 and January 30, 2022, Mr. Kry, seven other codefendants, and two unindicted co-conspirators: (i) conspired to

1

import and smuggle long-tailed macaques (*Macaca fascicularis*) from Cambodia into the United States in violation of the Lacey Act; and (ii) imported wild caught long-tailed macaques into the United States through the presentation of false and fraudulent CITES Permits and FWS Form 3-177s. *See generally*, Indictment, ECF No. 9 ("Ind."). Specifically, the government alleges that Mr. Kry delivered 92 long-tailed macaques over four separate visits to a Vanny Bio-Research Corporation ("VBRC") facility in Pursat, Cambodia. Ind. at 13, 15. After the long-tailed macaques were delivered to VBRC, certain wild-caught macaques were allegedly reclassified by VBRC as captive bred and illegally exported from Cambodia to the United States by falsely reporting that some of the long-tailed macaques within the shipments were captive-bred, when they were actually wild-caught. Ind. at 8.

The Cooperating Witness entered into a Cooperating Private Individual Agreement ("CPIA") with the U.S. Department of Interior – U.S. Fisheries and Wildlife Service ("USFWS") on October 22, 2018, nearly a year after the conspiracy allegedly began. The CPIA was valid for one year, and renewed on September 10, 2019, August 17, 2020, August 13, 2021, and October 6, 2022. According to the CPIA, the Cooperating Witness received "reasonable compensation" in exchange for information furnished to the USFWS. The government has represented that the Cooperating Witness received hundreds of thousands of dollars in payments and that the government is assisting the Cooperating Witness in "normalizing" his residency status in the United States in payment for his cooperation in the prosecution of Mr. Kry.

The Cooperating Witness will be the primary government witness at trial, and will provide the only testimony tying Mr. Kry to the alleged conspiracy. Defense counsel expects that the Cooperating Witness will testify regarding a video recording that he apparently made on September 1, 2019. Ind. at 13; Apr. 21, 2023 Hr'g Tr. at 38:1-39:8, 43:13-19. Documents

produced by the government further indicate that the Cooperating Witness "marked" crates of allegedly wild-caught long-tailed macaques for discovery by the United States government.

The testimony offered by the government, at the recent evidentiary hearing on Mr. Kry's Motion to Suppress, confirms that the Cooperating Witness's testimony is central to the government's case-in-chief at trial.  At the April 21, 2023 hearing, the government's agent testified that the Cooperating Witness provided video footage of Mr. Kry in Cambodia, contact information for Mr. Kry, and photographs of Mr. Kry.  Apr. 21, 2023 Hr'g Tr. at 14:6-8, 18:23-2, 43:13-17, 52:18-24, 53:21-54:5, 56:10-21.  And, based on discovery produced by the government, it appears that the Cooperating Witness testified before the grand jury and made repeated trips to Miami and Thailand to meet with USFWS agents.  The government has not, however, produced any transcripts, statements, or records of statements from these meetings.

## DISCOVERY PRODUCED BY THE GOVERNMENT

During the discovery process, the government produced over <u>five million</u> native, non-Bates stamped files, which—after the defense spent weeks processing the material—ultimately resulted in a corpus of <u>1.2 million unique files</u>.  Although the government has characterized this dump of data as "virtually open-file" discovery, the reality is that the government has effectively sought to outsource its *Brady* and *Giglio* obligations to the defense while simultaneously tasking the defense with finding the proverbial needles in the haystack.  While this case is presently set for trial the week of June 20, 2023, given the sizable volume of discovery produced by the government, the defense has filed a motion to continue trial until the week of September 11, 2023.  ECF No. 119. But even if the Court grants the motion to continue, the government cannot shift its burden of identifying possible *Brady* or *Giglio* to the defense by requiring the defense to sift through millions of non-relevant files, video and audio recordings for those materials which are possibly relevant

to Mr. Kry.  Defense counsel accordingly asks that the Court order the government to immediately take the steps necessary to comply with its discovery obligations.  This includes ordering the government to identify a subset of discrete documents consistent with government's obligations under *Brady* and *Giglio*, and produce early witness and exhibit lists.

On January 20, 2023, the government made its first document production to defense counsel (the "First Production").  The First Production included a production index and contained 242 native, non-Bates stamped files, including video recordings, investigation reports, emails, and an audio recording.

On February 17, 2023, the same day the parties' pretrial motions were due, the government made a second document production to defense counsel (the "Second Production").  The Second Production did not include a production index and consisted of roughly <u>five million native, non-Bates stamped files</u>, which took weeks to process before they were in a condition to be adequately reviewed by defense counsel.  The Second Production also contained hundreds of gigabytes of encrypted data that were inaccessible, as the government failed to provide passwords for this data.[1]  After processing the Second Production by de-duplicating files and removing the hundreds of thousands of junk system files, the defense was left with more than 1.2 million unique files, totaling over 3 terabytes of data and including some 12,750 audio and video files.  A cursory review of the materials reveals that the government has clearly padded the production with an overwhelming quantity of duplicative and extraneous files in a transparent effort to stymie the efforts of defense counsel to understand and act upon the evidence in this case.

---

[1] The government provided working passwords for some of these files on April 12, 2023, but approximately ten gigabytes of data still remained encrypted.  On May 8, 2023, the government provided an unencrypted copy of this data.

On April 19, 2023, the government made a third production of documents to the defense (the "Third Production"). These files were again encrypted and the defense was not immediately able to access them. On April 28, 2023, the government provided the defense with a flash drive containing an unencrypted version of the Third Production and a production index. The Third Production includes approximately 2,000 additional files. Like the other productions made in this case, the government produced native, non-Bates stamped files.

The government's productions contained vast quantities of superfluous data, such as spam emails from dating sites, WebMD, Microsoft Office 365, and thousands of other email domains. *See* Exhibit A [Domains Spreadsheet] (listing 17,516 email domains in the government's production set). The government's production also inexplicably includes more than 850,000 files that pre-date December 19, 2017—the day the alleged conspiracy is claimed to have begun. The defense can weed out a portion of these extraneous materials by electronically searching file names and including date filers. Such a methodical effort is time consuming and the defense is still left with hundreds of thousands of files to review before trial. Moreover, thousands of the audio and video files produced by the government bear only numeric or generic file names that in no way describe the contents of the recordings. And since the government has not produced transcripts of these recordings, they must be opened one-by-one. In sum, notwithstanding the technical resources available to defense counsel to sift through the government's productions, hundreds of thousands of records will require manual review.

The practical problem with this volume is that, despite the government's representations to the contrary, the defense has found critical material buried within the productions. By way of background, during earlier correspondence with the government over the defense's concerns about the volume of discovery, the government asserted that (a) its First Production was essentially "the

5

'hot document' file with the most relevant material required to be produced" and (b) the government did <u>not</u> believe that any "*Brady* material" or "impeachment material" was in the Second Production.  *See* Exhibit B [April 11-19, 2023 Email Chain with AUSA Watts-FitzGerald]. This claim by the government was not true.  On April 28, 2023, the defense identified—within the <u>Second Production</u>—what any objective reviewer would deem to constitute critical *Giglio* material, essential to the question of credibility of one or more of the government's central trial witnesses.  In short, the defense's concern that *Giglio* or *Brady* may well be lurking within the million-plus documents of produced discovery is well founded.

**ARGUMENT**

**I.   The Court Should Order the Government to Identify Exculpatory and Impeachment Discovery.**

It is a well-settled constitutional principle that the government must disclose exculpatory and impeachment evidence.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972).  *Brady* and *Giglio* evidence must be disclosed regardless of whether a defendant makes a request for exculpatory or impeachment evidence.  *See Kyles v. Whitley*, 514 U.S. 419, 432–33 (1995).

The government does not satisfy its disclosure obligations by unnecessarily flooding a defendant with extraneous materials.  *See, e.g.*, *United States v. Salyer*, 271 F.R.D. 148, 155 (E.D. Cal. 2010) ("[P]rosecutors can go to the extreme of disclosing <u>everything</u> as possible *Brady*/*Giglio* material such that a pearl of exculpatory or impeaching information is inevitably lost in the sea of the mundane . . . . [A] duty to disclose may be unfulfilled by disclosing too much . . . .") (emphasis in original), *aff'd as modified*, 2010 U.S. Dist. LEXIS 77617 (E.D. Cal. Aug. 2, 2010); *United States v. Maxwell*, No. 05-20571-CR, 2006 U.S. Dist. LEXIS 114125, at *15 (S.D. Fla. Jul. 12, 2006) ("[O]pen-file discovery does not relieve the government of its *Brady* obligations . . . .  To

6

the extent the government knows of any documents or statements that constitute *Brady* material, it must identify that material to [the defendant].") (quoting *United States v. Hsia*, 24 F. Supp. 2d 14, 29–30 (D.D.C. 1998) (alterations in original)).

In cases where voluminous and extraneous discovery is produced to the defense, courts routinely require the government to affirmatively designate *Brady* material within a document production. *See, e.g.*, *United States v. Saffarinia*, 424 F. Supp. 3d 46, 88 (D.D.C. 2020) ("[T]he government's argument—that it does not have an independent obligation to 'comb through the discovery to identify materials that [defendant] may find valuable in building his case,' . . . is unavailing. The government has an affirmative duty to disclose *Brady* material . . . ."); *United States v. Blankenship*, No. 5:14-cr-00244, 2015 U.S. Dist. LEXIS 76287, at *15–16 (S.D. W. Va. June 12, 2015) ("[T]he [government] should specifically designate any known *Brady* material as such and disclose the same to defense counsel."); *Salyer*, 271 F.R.D. at 155 (ordering the government to specifically identify by Bates number "the information which a reasonable prosecutor would view as exculpatory or impeaching").

Here, the defense asks that the Court order the government to do two things to comply with its *Brady* and *Giglio* obligations.

First, to specifically identify within the produced discovery any and all material that mentions, depicts, or otherwise makes reference to Mr. Kry.

Second, to specifically identify within the produced discovery any and all material that mentions, depicts, or otherwise makes reference to Omaliss Keo (Mr. Kry's alleged co-conspirator), the Cambodian Ministry of Agriculture, Forestry, and Fisheries, or the Government of Cambodia.

II. **The Court Should Order the Government to Produce an Early Witness and Exhibit List.**

Under Rule 16(d)(1) of the Federal Rules of Criminal Procedure, "[a]t any time the court may, for good cause . . . grant . . . appropriate relief" with respect to discovery. Fed. R. Crim. P. 16(d)(1). Where, as here, the government has produced voluminous documents to the defense, such relief may include ordering the government to specifically identify documents that it intends to use at trial. *United States v. Perraud*, No. 09-60129-CR, 2009 U.S. Dist. LEXIS 123150, at *33–34 (S.D. Fla. Dec. 24, 2009) (ordering, where the government produced 3 million documents to the defense, that the government produce an early exhibit list to the defense); *United States v. Upton*, 856 F. Supp. 727, 746–47 (E.D.N.Y. 1994) (ordering, where the government had produced thousands of pages of discovery, that the government identify documents it plans to rely upon at trial).

Here, the government has dumped over 3 terabytes of data on the defense. Even if defense counsel reviewed an average of 500 documents per day, it would take a team of ten lawyers *240 days* to review just the 1.2 million documents in the three productions. Additional resources would be necessary to review the other 12,750 video and audio records included in the production, which amount to roughly 250 hours of recordings. In light of this volume of discovery, the defense asks the Court to order the government to produce a witness and exhibit list to the defense three weeks before trial.[2]

Separately, and as a postscript, the defense has been unable to find any documents in either of the three productions which support the allegations contained in Overt Act paragraphs 17, 19, 23, 27, and 35 of the Indictment—notwithstanding the government's evidently untrue

---

[2] Should the Court grant Defendant's Motion to Continue Trial until September 11, 2023, this would require the government to produce its witness and exhibit list by August 21, 2023.

8

representation that such materials were included in the First Production. For this reason, the defense asks the government to identify those documents.

**III. The Court Should Order the Government to Produce Discovery Involving the Cooperating Witness.**

There is no legitimate reason for the government to delay production of *Giglio* material relating to the Cooperating Witness. *See* U.S. Dep't. of Just., Just. Manual § 9-5.001 D (2020). The only reason for the government to artificially withhold production of this obvious *Giglio* discovery is to hinder and delay the work of Mr. Kry's counsel in developing an effective trial defense. Given the scope and structure of the Indictment, preparation of an effective defense in this case requires counsel for Mr. Kry to conduct extensive fact investigations outside the United States—primarily in Asia and Mr. Kry's home country of Cambodia. That work is difficult and time consuming under the best of circumstances. By continuing to delay production of exculpatory and impeachment evidence relating to its key witness, the government creates the very practical risk that Mr. Kry's counsel will complete material aspects of their investigation, only to learn that the same investigative work must be repeated once the relevant *Giglio* discovery is finally produced.

<u>First</u>, information relating to benefits provided to the Cooperating Witness must be produced pursuant to *Giglio* and this Court's Standing Discovery Order. Consistent with *Giglio*, Local Rule 88.10 requires that after the entry of the Standing Discovery Order (entered in this case on January 10, 2023, ECF No. 46), the "government shall disclose to the defendant the existence and substance of any payments, promises of immunity, leniency, preferential treatment, or other inducements made to prospective government witnesses, within the scope of *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959)" and "supply the defendant

9

with a record of prior convictions of any alleged informant who will testify for the government at trial." S.D. Fla. Local R. 88.10(d) and (e).

The Standing Discovery Order similarly requires the production of information relating to any payments, promises of leniency, preferential treatment, or other inducements made to prospective government witnesses. *See* ECF No. 46; S.D. Fla. Local R. 88.10(d). The government has confirmed that the Cooperating Witness has received hundreds of thousands of dollars in payments and the government is providing assistance to "normalize" his residency status in the United States. The government has produced a schedule confirming some payments made directly to the Cooperating Witness, but has not produced any additional information about benefits, such as payment for trips to/from the United States or Thailand or any information surrounding its effort to "normalize" the Cooperating Witness's residency status in the United States. Thus, the Court should order the government to immediately produce all information pertaining to benefits being provided to the Cooperating Witness, including communications regarding efforts to "normalize" his residency status in the United States.[3]

Second, all transcripts, statements, or records of statements reflecting statements made by the Cooperating Witness, including grand jury testimony, FD-302s and/or ROIs or other reports of contact with the Cooperating Witness, as well as all evidence of wrongdoing, criminal conduct, or participation in the alleged conspiracy by the Cooperating Witness, either before or after entering into the CPIA with the USFWS, must be produced pursuant to *Giglio*.

Any statements provided by the Cooperating Witness regarding the alleged conspiracy, including any role he played in that alleged conspiracy *before* the entry of the CPIA, including the

---

[3] The defense also understands that the Cooperating Witness has family in Cambodia or Thailand, and specifically requests any information pertaining to the government's assistance in normalizing their residency status in the United States.

10

receipt of the long-tailed macaques at the VBRC facility, would tend to incriminate the Cooperating Witness—who acted as an agent for VBRC in receiving the long-tailed macaques. Thus, the Cooperating Witness's testimony regarding (a) the delivery of the long-tailed macaques, and what he and VBRC did with those long-tailed macaques following their delivery, as well as (b) independent evidence collected by USFWS or the government regarding the Cooperating Witness's participation in the alleged conspiracy, would indicate that the government declined to prosecute him and therefore constitute impeachment evidence under *Giglio*. *See Giglio v. United States*, 405 US. 150, 154–55 (1972) ("[E]vidence of any understanding or agreement as to a future prosecution would be relevant to [the witness'] credibility and the jury was entitled to know of it.").

Further, any statements provided by the Cooperating Witness after entering into the CPIA must also be produced. The government seeks to defer this production, maintaining that the statements are Jencks material. However, absent *complete* alignment among all statements, including the Cooperating Witness's grand jury testimony, these statements collectively would constitute *Giglio* material. The defense must have the opportunity to investigate any inconsistencies in the Cooperating Witness's rendition of the facts. Thus, all statements, testimony, or records of statements made by the Cooperating Witness, who, by the government's own acknowledgement, played a role in the alleged conspiracy, must be produced under *Giglio*.

Third, all communications related to the CPIA between the Cooperating Witness and the government must be produced. As set forth in Mr. Kry's Motion to Dismiss, ECF No. 92, the Indictment seeks to connect specifically-authorized conduct by a Cambodian official with allegedly criminal conduct by VBRC. Discovery produced to date confirms that the Cooperating Witness began working with USFWS agents almost a year after the alleged conspiracy began.

11

Thus the Cooperating witness likely took at least one overt act in furtherance of the conspiracy prior to signing the CPIA, and that he engaged in conduct to further the conspiracy after signing the CPIA. *See United States v. Garcia*, 2017 U.S. Dist. LEXIS 66498, *177 (D. N. M. May 2, 2017) (requiring disclosure of impeachment evidence regarding confidential informant's role in case); *United States v. Cousin*, No. 20-10071-ADB, 2022 U.S. Dist. LEXIS 18646, at *97-98 (D. Mass. Feb. 2, 2022) (finding that disclosure of materials related to a confidential informant is appropriate where it "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause").  Thus, communications between the Cooperating Witness and the government regarding the scope of the CPIA, what conduct by the Cooperating Witness would constitute entrapment, and the U.S. government's goals in securing the Cooperating Witness's assistance, are highly relevant to Mr. Kry's defense and must be produced under *Brady* and *Giglio*.

## **CONCLUSION**

For all of the reasons set forth herein, Defendant Masphal Kry respectfully submits that the Court should order the government to: (1) identify for defense counsel a discrete subset of documents consistent with government's obligations under *Brady v. Maryland*, *Giglio v. United States* and their respective progeny; (2) produce early witness and exhibit lists; (3) produce records of payments and information pertaining to benefits provided to the Cooperating Witness; (4) produce all transcripts, statements, or records of statements reflecting statements made by the Cooperating Witness, including grand jury testimony, FD-302s, and ROIs, as well as all evidence of wrongdoing, criminal conduct, or participation in the alleged conspiracy by the Cooperating Witness; and (5) produce all communications related to the agreement between the Cooperating Witness and the government.

**CERTIFICATE OF CONFERRAL**

Pursuant to Local Rules 7.1 and 88.9, counsel for Mr. Kry has conferred with the government several times over the government's productions. In short, the government opposes the specific relief that Mr. Kry is requesting in this motion.

Dated: May 26, 2023               Respectfully submitted,

By:   **Mark J. MacDougall**
Mark J. MacDougall (*Pro Hac Vice*)
Stacey H. Mitchell (*Pro Hac Vice*)
Allison T. Coffin (*Pro Hac Vice*)
Dakota L. Kann (*Pro Hac Vice*)
Jane M. Mahan (*Pro Hac Vice*)
*Counsel for Masphal Kry*
Akin Gump Strauss Hauer & Feld LLP
2001 K Street NW
Washington, DC 20006
Telephone: (202) 887-4000
Fax: (202) 887-4288
E-mail: mmacdougall@akingump.com
         shmitchell@akingump.com
         acoffin@akingump.com
         dkann@akingump.com
         jmahan@akingump.com

**John R. Byrne**
John R. Byrne (Fla. Bar Number: 0126294)
john@maderalbyrne.com
*Counsel for Masphal Kry*
Maderal Byrne & Furst PLLC
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Telephone: (305) 520-5690