UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20340-WILLIAMS/REID

UNITED STATES OF AMERICA,

v.

MASPHAL KRY,

    Defendant.
_____/

### REPORT AND RECOMMENDATION ON DEFNDANT'S MOTION TO SUPPRESS STATEMENTS

This cause is before the Court on Defendant Masphal Kry's ("Defendant" or "Kry") Motion to Suppress Statements. [ECF No. 60]. The Motion was referred to me for a report and recommendation by the Honorable Kathleen M. Williams. [ECF No. 71]. The Court held an evidentiary hearing on this matter on April 21, 2023, and April 28, 2023. *See* [ECF Nos. 96; 111]. Having considered the Motion to Suppress, the evidence, and being otherwise fully advised in the premises, it is **RECOMMENDED** that the Motion to Suppress be **GRANTED in part and DENID in part**.

### BACKGROUND

On November 3, 2022, Defendant, and several co-defendants, were charged in a sealed superseding indictment with conspiracy to violate the Lacey Act, in violation of 18 U.S.C. § 371, and smuggling, in violation of 18 U.S.C. § 545. [ECF Nos. 7–9]. Specifically, he has been charged with conspiracy to import and smuggle long-tailed macaques into the United States, in violation of 18 U.S.C. § 371 (Count 1) and smuggling in violation of 18 U.S.C. § 545 (Counts 2–8). [*Id.*]. He filed the instant Motion to Suppress, in which he seeks to suppress: (1) post-arrest statements

1

he made on November 16, 2022; and (2) any materials collected from his cell phone seized the same day. [ECF No. 60]. The Government filed its Response [ECF No. 70], and Defendant filed his Reply [ECF No. 78].

At the evidentiary hearing the Government called as witnesses United States Fish & Wildlife Service ("Fish & Wildlife") Special Agent Fernando Gattorno ("Agent Gattorno") and Fish & Wildlife Special Agent Darren Ray Flinn ("Agent Flinn"). *See* [ECF No. 108]. Defendant called as an expert witness Dr. William G. Eggington. [*Id.*]. The matter is ripe for adjudication.

## FINDINGS OF FACT

Kry is a Cambodian citizen and government official, who served as the Director of Cambodia's Department of Wildlife and Biodiversity. Kry was arrested on a sealed warrant on November 16, 2022, at John F. Kennedy International Airport ("JFK") in New York, while in transit to attend a convention of International Trade in Endangered Species of Wild Fauna and Flora in Panama City, Panama. He was taken to a room in JFK to be processed and questioned by Fish & Wildlife officials.

Around 10:19 a.m. Fish & Wildlife agents first met with Kry. Agent Gattorno and Special Agent Dorothy Manera asked Kry whether he could speak or read English. Kry told them that while he could read English, his speaking abilities were "not so good … [that he could] not fully understanding [sic] maybe 50, 50, or 40." [ECF No. 150-3 at 2, 12]. The agents told him he was under arrest, and provided him with a copy of his arrest warrant in English. The agents also gave him a written *Miranda* warning form in his native Khmer language. The agents asked him to follow along on the Khmer *Miranda* form, as they read the warnings in English.

Kry told the agents he did not fully understand what the agents were reading to him. He asked to have a colleague who was traveling with come into the room to assist with translating.

2

[*Id*. at 16-17]. While the agents denied that request, they did inform Kry that they would get a Khmer interpreter. During that time, Kry made it clear that he did not fully understand he was under arrest. He asked the agents "how long will it take for the questioning … because, like my flight's [sic] probably in around three o'clock." [*Id.* at 4]. Agent Gattorno told Kry that "I don't think you're understanding. You're not going to make your flight." [*Id.*]. When Kry asked him why, Agent Gattorno told him it was "[b]ecause a judge wants to see you." [*Id.*].

While waiting for the Khmer interpreter, the agents inventoried Kry's property, including his cell phone. They asked him to unlock his cell phone in front of them so they could see his passcode, and then seized the cell phone. Kry complied. Also, while waiting for the interpreter he told the agents about his position working for the Cambodian government in wildlife conservation and seemed to suggest that someone may have used his identity illegally ("I'm sure that someone use my name, my address, or my position to do the trade even …"). [*Id*. at 27]. He also asked how long the questioning would take and whether he would be in the room "all night." [*Id.*]. Agent Gattorno confirmed that they were only waiting for an interpreter in order to continue with questioning and explained that only a judge could determine how long he would be detained. [Id. at 28-29]. He also repeatedly asked to meet with the Cambodian ambassador or that the ambassador be notified of his arrest. [*Id.* at 29-32, 33-37]. He expressed concern that the translator may not be able to properly translate and asked that someone from the embassy translate for him [*Id.* at 34, 35].

After approximately an hour, the Khmer interpreter joined by telephone and the agents again began to read Kry his *Miranda* rights. The agents again explained to Kry that before they could discuss the charges against him, they had to inform him of his legal rights in the United States.

3

Despite the presence of the interpreter, things did not go smoothly. As the agents attempted to explain to Kry his *Miranda* rights, Kry, speaking through his interpreter, repeatedly expressed or otherwise demonstrated a lack of understanding of the rights afforded to him. When instructed of his right to counsel and offered the opportunity to have an attorney to represent him, Kry stated "[t]hank you for offering a lawyer for me, but I will need to meet the embassy first because I am a civil servant," indicating he believed he must speak to a representative of the Cambodian embassy before he could obtain counsel. *See, e.g.,* [ECF No. 105-3 at 40, 42, 43, 44]. Additionally, after having been extensively advised of his rights Kry told the interpreter, "I know the rights, but he has already started to do the questioning. How can I have [a lawyer] if he has already started?" [*Id.* at 40]. Kry showed similar confusion regarding his right against self-incrimination and the legal process in the United States. Although he initially indicated that he understood he had the right to remain silent, he later expressed confusion with this concept asking, "where will [the agents] take the [waiver] documentation," and that if questioning proceeds "the problem is that he said that my responses would be used in a court." *See, e.g.,* [*Id.* at 40, 41]. After Agent Gattorno tried to resolve this confusion by telling Kry that the *Miranda* form was just meant to ensure he understood his rights in the United States, and that Kry should not share any information until he understood those rights, Kry stated that "I know that. I understand that it will not be 100%. Like what I said, I will share with them some information, and for the information that I am not certain of, I can discuss with the embassy later." [*Id.* at 42].

Additionally, when the agents asked Kry whether he understood his *Miranda* rights as they explained them and as written in Khmer, he stated, "I have not understood the rights in the U.S., but I have read the Khmer document, so I have understood *some* parts of it." [*Id.* at 43] (emphasis added). While the agents explained certain of the rights, they never asked Kry which specific part

4

of the Khmer document, or which rights in the United States, he did not understand. The agents did explain to Kry, however, that the Khmer document in front of him was a waiver and told the interpreter to instruct Kry that "if he wishes to discuss anything, he needs to waive these rights so that we can ask him question and we can engage in a dialogue." [*Id.*].

Kry again expressed confusion, telling the interpreter, "I do not understand on the waiving part. Does it mean that if I want to speak with him, I need to sign on the document? Is it right?" [*Id.* at 44]. When he was told that was correct, Kry asked "if I do not agree to be in this discussion … can I just consult with the embassy?" [*Id.*]. Agent Gattorno again explained that he did not need to speak with them if he did not wish, but he was still entitled to have his consulate notified, although they could not control whether a consular official would show up. [*Id.*]. Agent Gattorno then reiterated that "in order for us to discuss anything associated as to why he is being arrested today … we would require signing the waiver witnessed by both myself and the other agent in the room." [*Id.* at 45–46]. Kry then asked, "if there is no signature, there is no progress, shall I, should we continue to sign?" to which Agent Gattorno responded, "if he is agreeing to waive his rights and speak to us … [t]hat is not a problem … [w]e can do it verbally if he chooses, it doesn't have to be signed." [*Id.*]. Kry then verbally assented, and Agent Gattorno asked "[s]o we are clear, he is waiving his rights as we have read them and he is willing to speak to us?" [*Id.*]. Kry responded that he "will do so." [*Id.*]. From there, the agents proceeded to question Kry regarding the charges. The interrogation appears to have lasted a little under three hours.

On January 4, 2023, 49-days after Kry's cell phone was seized, Fish & Wildlife agents sought a search warrant for the cell phone. The search warrant was obtained, and using advanced software, Fish & Wildlife Agent Darren Flinn gained access to the cell phone.

5

## APPLICABLE LAW

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court held that the Constitution prohibits the use at trial of statements made by a criminal defendant during a custodial interrogation unless the statements were voluntarily made and had been made after the defendant had been advised of specific rights. These *Miranda* rights require that a law enforcement officer inform a defendant that:

> he has the right to remain silent, that anything he says can be used against him a court of law, that he has the right to the presence of any attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479. Once the *Miranda* warnings have been given, and the accused has been given the opportunity to exercise those rights, the suspect may waive those rights as long as the waiver was done knowingly, voluntarily, and intelligently. *Id.* A court must make two distinct findings to conclude that a defendant has made a knowing and voluntary waiver of the *Miranda* rights. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). First, the defendant's decision to relinquish the rights and make a statement must be "voluntary in the sense that it was the product of a free and deliberate choice rather than the intimidation, coercion, or deception." *Id.* Second, the defendant's decision must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Whether a waiver meets these requirements is determined by analyzing the totality of the circumstances regarding the interrogation. *Id.* at 421. In doing so, a court must consider "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Butler*, 441 U.S. at 374–75.

I. **Whether Kry Knowingly Waived his *Miranda* Rights**

While the government made a concerted effort to ensure that Kry understood his Miranda rights before he was questioned, the record does not support a finding that his waiver was knowing and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Kry argues that "while law enforcement may have read [him] his *Miranda* rights and provided him with [a] translated copy of these rights in his native language, it is clear that he did not understand these rights." [ECF No. 60 at 13]. While he was afforded an interpreter and given a Khmer language *Miranda* form, he maintains he did not understand the *Miranda* warning and repeatedly expressed his lack of understanding.

Kry argues that his command of the English language is quite limited. In fact, the record shows he at first requested that his colleague who was more proficient in English be allowed to come in and translate for him. When his request was rejected, he repeatedly asked for the Cambodian embassy to be contacted and for a representative of the embassy to come to his assistance. He even requested that someone from the embassy would be better able to explain his rights to him than a translator provided by the agents.

The Government, on the other hand, argues that the agents provided Kry with "extensive advice in both written and oral form," including in his native Khmer language. [ECF No. 70 at 8]. The agents provided Kry with "a constitutionally correct rendition of his *Miranda* rights, in his native tongue, in the English language in which he had demonstrated a facility, and through the oral translation from English to Khmer by the translator." [*Id.* at 11]. Further, the Government reasons that Kry's level of education, law enforcement training, and role as a Cambodian Government official indicate he has the requisite level of sophistication to understand the implications of the *Miranda* rights as explained to him. Thus, the Government reasons that

7

"extensive efforts were made to correctly inform [Kry] of all of his rights, and those efforts were successful." [*Id.*].

The Government offered various evidence to demonstrate that Kry has sufficient comprehension in English to have understood the *Miranda* warnings given to him, especially in light of the Khmer waiver form and interpreter he was provided. The Government introduced a video in which Kry spoke English and discussed relatively complex topics regarding smuggling and business. The Government also argues that during Kry's interrogation at JFK he often spoke in English without the use of the interpreter, thereby demonstrating his proficiency.

Kry further relies upon the testimony of expert witness Dr. William Eggington, who specializes in forensic linguistics. During the evidentiary hearing on the instant Motion to Suppress, Dr. Eggington testified that Kry "could not have understood what was occurring to him in the [JFK] interview." [ECF No. 108 at 167]. Dr. Eggington surmised that Kry can function in rudimentary English conversations such as ordering a meal or speaking about family. [*Id.* at 166]. Yet, Dr. Eggington posits that Kry's English, which he labels as being at the intermediate-low level, would not allow him to understand concepts such as the *Miranda* rights. [*Id.*]. The Government argues, and this Court does not necessarily disagree, that there may be problems with the methodology Dr. Eggington employed in arriving at his conclusions. The Court, however, need not reach that issue for the purposes of the Motion to Suppress.

The Government's challenge here, however, is more than purely English comprehension. Kry repeatedly questioned the agents on the legal ramifications of the *Miranda* document they placed before him, asked for help from his embassy before agreeing to be interviewed by the agents, expressed his concern that the Government's interpreter would not be able to assist him in understanding the effects of the document, and finally agreed to the interview only after he was

8

assured that he need not sign the document. The interaction between Kry and the agents, when reviewed in its totality, shows that Kry was concerned that he did not understand the *Miranda* warning and why he was required to or requested to sign it, and only conceded to the interview when the *Miranda* warning was essentially discarded.

Here, despite the presence of an interpreter and the Khmer waiver form, Kry expressed and demonstrated a clear misunderstanding of these rights. Because of this failure, Kry could not knowingly waive them.

Kry relies heavily on *United States v. Lewis*, No. 11-20745-CR, 2012 WL 6569373 (S.D. Fla. Dec. 17, 2012). The case is instructive. In *Lewis*, after the defendant was given his *Miranda* warnings, he expressed confusion regarding whether he had to pay for an attorney to be present during the interrogation. *Id.* at *2. The officers never clarified this misunderstanding, and instead reiterated to the defendant that the Constitution affords him the right to an attorney, and told him "you talk to us now without a lawyer, or you go to jail and you deal with it on your own." *Id.* The defendant subsequently signed a *Miranda* waiver form. *Id.* In evaluating whether the defendant had knowingly waived his right to counsel, the court concluded that the defendant's "request for clarification … indicates that [he] did not fully understand the right to counsel, specifically the right to appointed counsel." *Id.* at 6. The court noted that because the officers failed to resolve the defendant's clear confusion, and merely reiterated the *Miranda* warning itself, the defendant never had a full awareness of the right to counsel when he waived it. *Id.* at 6–7.

Similarly, in *Hart v. Attorney Gen. of the State of Fla.*, a detective went "to great lengths to apprise Hart of his rights." 323 F.3d 884, 893 (11th Cir. 2003). The detective spent a significant amount of time explaining to the defendant each of his *Miranda* rights. *Id.* Eventually, the defendant signed a rights waiver form indicating he understood these rights and would speak with

9

the detective without counsel. *Id.* Shortly after, however, the defendant spoke with a different detective. *Id.* The defendant asked this detective what the pros and cons were of retaining an attorney. *Id.* at 894. The Eleventh Circuit found that "[a]lthough asking for the pros and cons of hiring a lawyer is not an unequivocal request for counsel, it does indicate that [the defendant] did not fully understand his right to counsel and was asking for clarification of that right." *Id.*

The exchange here is similar to those in *Lewis* and *Hart*. As in *Lewis*, Kry both professed a misunderstanding of his *Miranda* rights, and demonstrated this understanding through numerous questions to the agents. While the agents reiterated the *Miranda* litany, particularly the advice pertaining to the right to counsel, they never adequately inquired into what Kry did not understand when he said he only understood *some* of the rights on the Khmer waiver form. This failure is crucial. Kry's repeated requests to speak to an ambassador or consular official before he spoke to an attorney should have put the agents on notice that he did not fully comprehend his rights under *Miranda*. The same is true regarding Kry's right against self-incrimination. After he indicated he understood he had the right to remain silent, he repeatedly asked whether he would still be able to speak to an ambassador without signing the waiver, what would happen to the evidence obtained during the interrogation, if his statements would be used in court, and if he did not sign the waiver would his case progress further. Taken as a whole, these statements and numerous requests for clarification demonstrate that Kry did not fully understand his *Miranda* rights.

Even after Kry explained that he did not understand everything in the Khmer document, the agents did not clarify or inquire what he did not understand, but instead began to discuss his waiver:

> **MASPHAL KRY:** [FOREIGN LANGUAGE: *I have not understood the rights in the U.S., but I have read the Khmer document, so I have understood some parts of it.*

> **INTERPRETER:** Ok. So, I did not understand all the rights a—in the United States yet, but I do understand the document written in Khmer [INDISCERNIBLE 01:20:36] – most of it.
>
> **FERNANDO GATTORNO:** Okay so, with that being said, this is a waiver in front of him, and if he wishes to discuss anything, he needs to waive these rights so that we can ask him questions and we can engage in a dialogue.

[ECF No. 105-3 at 43].

As such, the gravamen of Kry's constitutional arguments relate less to Kry's English language proficiency, but more to the agents' failure to ensure he actually understood his *Miranda* rights. This is an issue that could have arisen with an English speaker such as that in *Lewis*. Although the agents here spent a significant amount of time attempting to explain Kry his *Miranda* rights, they did not adequately do so. Consequently, Kry could not have knowingly waived his *Miranda* rights, and any statements made during the interrogation should be suppressed. Having reached this conclusion, the Court need not consider whether Kry actually invoked his right to counsel.

**II.    The Cell Phone Evidence**

Kry argues any evidence obtained from his cell phone should be suppressed because his act of giving the agents his passcode was testimonial in nature, and therefore obtaining this information prior to being Mirandized violates his Fifth Amendment right against self-incrimination. Kry also asserts the agents obtaining the passcode violated Kry's Fourth Amendment rights. The Government argues that obtaining the passcode was a proper border search, or alternatively, should be admitted under the inevitable discovery doctrine. Additionally, the Government contends that Kry showing the agents his passcode was not testimonial in nature, and therefore did not violate Kry's Fifth Amendment rights against self-incrimination.

11

A. **Fourth Amendment Issues**

The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, where law enforcement wish to conduct a search to discover criminal wrongdoing, they must obtain a search warrant. *Riley v. California*, 573 U.S. 373, 382 (2014). Searches at the border, however, "have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." *United States v. Ramsey*, 431 U.S. 606, 619 (1977). As such, border searches "never" require probable cause or a warrant. *Id.* Rather, border searches are governed by the Fourth Amendment's "more amorphous reasonableness standard." *United States v. Villabona-Garnica*, 63 F.3d 1051, 1057 (11th Cir. 1995). This even holds true with highly intrusive forensic examination of electronic devices at the border. *See United States v. Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018) (explaining that there "is no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property [at the border]").

Here, the applicability of the border search exception is complicated by the fact the agents did not search the cell phone at the border. Rather, the agents seized the cell phone, and retained it for 49-days before applying for a search warrant. The Eleventh Circuit does not appear to have addressed this specific scenario. Other courts, however, have. *See United States v. Kolsuz*, 185 F. Supp. 3d 843, 851–52 (finding that "the fact that the forensic search of defendant's iPhone occurred four miles from [the airport] and was not completed until approximately one month after the phone was seized does not alter the conclusion that the search of defendant's iPhone was a border search. Several courts have held, an off-site forensic search of an electronic device over a long period of time is nonetheless a border search where, as here, the electronic device was seized

12

at the border, the device was never cleared to pass through the border, and therefore the defendant never regained an expectation of privacy in [the electronic device]") (internal quotation marks omitted) (citing *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013)).

Considering that forensic examinations of electronic devices are permitted at the border *Touset*, 890 F.3d at 1234, the Government's seizure and subsequent forensic examination of Kry's cell phone constitutes a valid border search, even though the search was done in a different location 49-days later. As such, the Government was not required to obtain a warrant here but appear to have done so out of an abundance of caution. As such, *United States v. Mitchell*, 565 F.3d 1347, 1350 (11th Cir. 2009) is inapplicable here, because that case deals with unreasonable delays in obtaining a warrant. Here, no warrant was necessary as the delayed search still constituted a border search. Consequently, there was no Fourth Amendment violation.

### B. Fifth Amendment Issue

The Fifth Amendment provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This protection ensures that statements a defendant makes "during custodial interrogations cannot be used against that defendant in court unless the government first advises the suspect of the constitutional rights set forth in *Miranda*." *United States v. Vallerius*, No. 17-CR-20648, 2018 WL 2325729, at *3 (S.D. Fla. May 1, 2018), *report and recommendation adopted*, No. 17-20648-CR, 2018 WL 2324059 (S.D. Fla. May 22, 2018). Whether a person is in custody is determined when "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement … to such extent that he would not feel free to leave." *Id.* (quoting *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987)). This standard differs, however, when an individual is seeking entry to the United States. *Id.* "[W]hether such a person can be considered

13

'in custody' for purposes of *Miranda* 'should be interpreted in light of the strong government interest in controlling [our nation's] borders." *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)). Given the government's interest in securing the nation's borders, the Fifth Amendment right against self-incrimination is not violated by routine questioning of those entering the United States. *Id.* (citing *United States v. Lueck*, 678 F.2d 895, 899 (11th Cir. 1982)). Accordingly, "questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam and to the degree associated with formal arrest." *Id.* (citing *Moya*, 74 F.3d at 1120).

In *Moya* the Eleventh Circuit considered a number of factors in evaluating whether an individual is "in custody" at the border such that their Fifth Amendment right against self-incrimination is triggered, and *Miranda* warnings are required. *Moya*, F.3d at 1119. These factors are whether: (1) the individual had been moved or physically restrained by officers on the way to the scene of the interview; (2) handcuffs were used prior to the interview; (2) officers had their guns drawn at the time the interview took place; (4) the individual was booked, told of formal accusations, or told he was under arrest; and (5) the individual made any admission during the interview that would leave a reasonable person to conclude he would be arrested immediately. *Id.*

In the instant case, there is no doubt Kry was in custody. The Government concedes as much. *See* [ECF No. 70 at 5] (noting that Kry "was clearly in custody during the period at issue, having been arrested by agents. He was made aware of that status, shown a copy of the arrest warrant, and advised he could not leave"). Consequently, this case is readily distinguishable from those in which law enforcement obtained passcodes to electronic devices at the border where the defendant was not in custody. *See Vallerius*, 2018 WL 2325729, at *4–5 (finding that DEA agents obtaining a suspect's passcodes to electronic devices at an airport did not violate the Fifth

14

Amendment because the suspect had not been subject to custodial interrogation). As such, the question of whether the agent's obtaining the passcode prior to Kry being Mirandized violates his Fifth Amendment rights, comes down to whether the act of showing agents his passcode is testimonial in nature. The Court finds it is.

In *In re Grand Jury Subpoena Duces Tecum Date March 25, 2011*, the Eleventh Circuit considered whether compelling a suspect in a child-pornography case to decrypt electronic devices would constitute testimonial activity triggering the suspect's Fifth Amendment right against self-incrimination. 670 F.3d 1335, 1346 (11th Cir. 2012). In concluding it would, the court noted that "the decryption and production of the hard drives would require the use of the contents of Doe's mind and could not be fairly characterized as a physical act that would be nontestimonial in nature." *Id.* Rather, the court found that "the decryption and production would be tantamount to testimony by [the suspect] of his knowledge of the existence and location of potentially incriminating files; of his possession, control, and access to the encrypted portions of the drives; and of his capability to decrypt the files." *Id.*

This situation is similar. By compelling Kry to show them his passcode, while he was subject to custodial interrogation prior to being Mirandized, the agents overstepped. The act of providing the passcode was not merely physical, but was testimonial in nature, and therefore triggered Kry's right against self-incrimination. Therefore, what is left for the Court to determine is the Government's argument that the passcode was subject to inevitable discovery.

Generally, the "exclusionary rule bars admission of evidence resulting from a Fourth Amendment violation[.]" *United States v. Watkins*, 10 F.4th 1179, 1180 (11th Cir. 2021) (en banc) (hereinafter "*Watkins I*"). An exception to this general rule, is known as the inevitable discovery doctrine. In order to avail itself to this exception, the Government must show: (1) "by a

preponderance of the evidence that if there had been no constitutional violation, the evidence in question would have been discovered by lawful means[;]" and (2) "that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *United States v. Watkins*, 13 F.4th 1202, 1211 (11th Cir. 2021) (hereinafter "*Watkins II*"). The "requirement that the alternative means of discovery be actively underway before the constitutional violation occurs is limited to cases where the alternative means of discovery is a search warrant." *Id.* at 1215. Where the government is claiming the "alternative means of discovery" is not a search warrant, "active pursuit" can be established by demonstrating "that the police would have discovered the evidence by virtue of ordinary investigation of evidence or leads already in their possession." *Id.* (internal quotation marks and citation omitted).

Here, as explained above, the Government would have inevitably discovered the contents of Kry's cell phone because they were permitted to (and did) seize the cell phone as part of a border search. This seizure was in fact done through the process of its ordinary investigation and apprehension of Kry at the airport. Thus, the Government was in fact pursuing a lawful avenue of discovery. The only issue then is whether the Government could have gained access to the cell phone without the passcode Kry provided.

Kry argues that "the Government offers only conclusory statements that the software programs they use have 'a very high success rate' in unlocking phones and that, because of this, they would have eventually accessed the contents of Mr. Kry's phone without the passcode." [ECF No. 78 at 12]. As support for its argument that the Government has not met its burden, Kry cites *United States v. Ansah*, No. 117CR003811WSDJSA, 2018 WL 4495523, at *8–9 (N.D. Ga. June 12, 2018), *report and recommendation adopted*, No. 117CR3811MHCJSA, 2018 WL 3414318 (N.D. Ga. July 13, 2018). In that case, law enforcement obtained the password to the defendant's

16

cell phone in violation of his Fifth Amendment rights. *Id.* The government argued that the contents of the cell phone should not be suppressed under the inevitable discovery doctrine. *Id.* at 8. In rejecting the government's argument, the court noted that the law enforcement officer "testified that at some point he consulted with an unnamed 'forensic computer analyst' … who expressed the belief that he (the analyst) would have been able to access the phone without the password." *Id.* at 8. Further, the only explanation offered regarding the procedure the analyst would use to access the information was that it would be accomplished "using something called Cellebrite[.]" *Id.* The court refused to accept this explanation because it "was essentially provided with the bare hearsay conclusion of an unknown witness without any explanation about a complicated technical matter … [and therefore could not] attach much weight to this statement." *Id.*

*Ansah* is very different than the situation this Court is confronted with. The Government presented the testimony of the agent who explained exactly how he gained access to Kry's cell phone without using the passcode Kry provided. *See* [ECF No. 108 at 112–26]. The agent provided the Court with an exhaustive explanation of the software and techniques he used to access Kry's cell phone. *See generally* [*Id.*]. Despite having access to the passcode prior to his attempts to gain access to the cell phone, he explained that he was given a request by the assigned case agent to "look at the same phone but as if we did not know the passcode to treat it in a manner as it was a phone with no information … [and] see if we can still extract any data." [*Id.* at 118]. The agent explained that he used the Cellebrite Premium software program to achieve this end and explained how this software works. [*Id.*]. He further informed the Court, that while the program may vary in terms of how long it may take to access a cell phone, here the program gained access to Kry's cell phone in "approximately ten minutes." [*Id.* at 19]. So, unlike in *Ansah*, the Government provided a credible witness who provided a thorough explanation of the technical aspects of gaining access

to the cell phone, and notably, actually did gain access to the cell phone. Consequently, the Government has shown that it would have inevitably gained access to Kry's cell phone. As such, the cell phone and its contents should not be suppressed.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Defendant Masphal Kry's Motion to Suppress Statements [ECF No. 60] be **GRANTED in part and DENID in part**. Specifically, it is recommended that Kry's statements made during the November 16, 2022, interrogation be suppressed, and that the contents of Kry's cell phone be admitted.

Objections to this Report may be filed with the district judge within **fourteen** (14) days of receipt of a copy of the Report. Failure to timely file objections waives a party's right to review issues related to the Defendants' plea under Fed. R. Crim. P. 11 before the District Judge or the Court of Appeals. *See* Fed. R. Crim. P. 59(b)(1), (2); 11th Cir. R. 3-1; *Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 1st day of June, 2023.

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc:  **United States District Judge Kathleen M. Williams;**

**All Counsel of Record**